**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile:  (949) 706-6469

Attorneys for Plaintiff

# UNITED STATE DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ESPARZA, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>UAG ESCONDIDO A1 INC., a Delaware corporation, dba ACURAOFESCONDIDO.COM; and DOES 1 through 10, inclusive,<br><br>　　　　　　Defendants. | Case No. 3:23-cv-00102-DMS-KSC<br><br>**SECOND AMENDED COMPLAINT** |

# I. INTRODUCTION

Defendant UAG ESCONDIDO A1 INC., ("Defendant") secretly enables and allows a third-party to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at www.acuraofescondido.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties who use the private chat data to bombard the unsuspecting visitor with targeted marketing.

Defendant does this without visitors' informed consent. As such, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*

# II. JURISDICTION AND VENUE

1. Plaintiff Miguel Esparza ("Plaintiff") does not dispute Defendant's grounds for removal and the propriety of this Court's jurisdiction and venue pursuant to 28 U.S.C. §§ 1332(a), 1441, 1446, and 1453.

# III. PARTIES

2. Plaintiff is a resident of California. Within the last year and while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did she consent thereto.

3. Defendant is a car dealership that operates an e-commerce website store that sells to consumers throughout the United States.

4. Defendant also owns, operates, and/or controls the Website, which at relevant times, offered an online "chat" feature for consumers to communicate directly with Defendant through the Website.

# IV. FACTUAL ALLEGATIONS

A. **Background of CIPA.**

5. CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is

viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

6. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

7. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . . .* ***When people are chatting, you have direct access to their exact pain points.***"). *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited Jul. 14, 2023) (emphasis added).

8. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**B.  Defendant Allows CarNow to Intercept Consumers' Chats During Transmission Through Its Chat Feature.**

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*[C]ompliance [with CIPA] is not difficult. A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature**, personal data of a consumer/website visitor, that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA* and other applicable Data Privacy laws.") (last visited Jul. 14, 2023) (emphasis added).

9. To enable eavesdropping, Defendant has allowed a third party, CarNow, to embed its chat technology code into the chat feature offered on Defendant's Website. Indeed, whenever a consumer chats via Defendant's Website, the chat is routed *through* CarNow's servers so they may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access.

10. CarNow's product, CarNow Real-Time Messaging, is a type of automatic routing software that automatically acquires and transmits user chat communications to CarNow without any active input from either Defendant's employees, agents, or human representatives. CarNow Real-Time Messaging acquires Website visitors' chat communications by first having its software to route them to CarNow's own computer servers that it owns, controls, and maintains. The secret code enables and allows CarNow to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they *think* they are having with Defendant, even when such conversations are private and contain personally identifiable information ("PII") – as Plaintiff's did. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

14. Indeed, CarNow not only admits that it receives and records chat transcripts, but it explicitly advertises this feature to its customers. CarNow does this by deploying its own live messaging features onto its customers' websites by which it gathers data, while unsuspecting consumers see a chat feature that purports to be the customer's own.

15. CarNow's customers, like Defendant, are well aware that consumer data is being collected and used by CarNow. Consumers like Plaintiff, on the other hand, are not.

16. One might reasonably wonder why CarNow would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it all about money.

17. The service that CarNow provides its customers is its Real-Time Messaging platform, which the company boasts "combines CarNow's best online engagement tools."

18. Among these engagement tools is CarNow's "Integrated Intelligence" module, which purports to drive sales by "asking the right questions at the right time while simultaneously creating the big picture profile for your staff."

19. In other words, CarNow specifically advertised to its customers, like Defendant, that it would take and use consumers' personal data to build custom digital profiles of Website visitors.

20. Indeed, CarNow's marketing materials even provide an image of the CarNow live chat interface, which specifically shows it gathering PII about Website visitors (including names, phone numbers, and email addresses) as a demonstration of its ability to gather consumer data:



21. Unlike the CarNow messaging client on CarNow's own website, however, the messaging client on Defendant's Website contained no indication that it was a CarNow product; rather, it was branded to look like Defendant's own chat module.

22. The CarNow Privacy Policy makes it clear that it will happily share information—including consumers' PII—with third parties, including any of its affiliates, for sweepstakes, etc. It also makes clear that CarNow "may sell personally identifiable information (name, email address, and/or phone number) to dealer clients for their lead generation and other marketing services." *See* https://www.carnow.com/privacy/ (last accessed February, 2024).

23. Of course, Defendant already knows that CarNow will sell it consumer information—that is part of what it signs up for when it pays for CarNow's service in the first place. After all, CarNow advertises that one of its perks is that it offers "live lead notifications," by which its customers' selling agents "can capitalize on qualified, in-the-moment prospects by activating a notification that prompts and prepares a manager to enter the conversation at just the right moment – anytime, anywhere, and on any device."

24. A testimonial advertised on the CarNow website further cements that the entire purpose of the company is to gather consumer data—data which is then routed *directly to CarNow*, without consumers' knowledge or consent, to create digital profiles: "Once we fully committed to CarNow **and had all of our information flow through their chat tool**, we've been able to virtually double our total website closing ratio."

25. CarNow boasts that it is integrated with social media platforms like Meta/Facebook and can become a "lead generation machine." *See* https://www.carnow.com/integrate-with-messenger/ (last visited February 2024).

26. Defendant has synched its chat feature with Facebook. The integration allows various software sub-systems to share data to operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "plan to profit from private chats." *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last visited Jul 14, 2023) (emphasis

added). As Bloomberg explained, Meta's software integration "can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger." (*Id.*)

27. So how does it work? First, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with CarNow. Second, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. Third and finally, after the chat transcripts intercepted by CarNow are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits and interactions.

28. Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers." *See e.g.,* https://www.kustomer.com/product/customer-service/ (last visited July 2023). Indeed, all of the schemers – Defendant, CarNow, and Meta – profit from secretly exploiting the chat data through targeted social media advertising and, in CarNow's case, the direct sale of consumer data, because "*Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand…. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*" *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited Jul. 14, 2023).

29. But as CarNow's own website reveals, it does more than that. It advertises its customers can link their "Facebook page with CarNow to send inventory and resources, manage customer inquiries, and send all Facebook leads directly to [its customer's] CRM."

30. In other words, CarNow specifically provided Defendant with services that would transfer customer data from both Defendant's Website and its Facebook page to CarNow—all without customer knowledge or consent.

31. As such, CarNow does more than merely provide a storage function for Website users' chat communications with Defendant. It is more than the proverbial "tape-recorder" in the hand of Defendant. Instead, CarNow uses its record of Website users' interaction with Defendant's chat feature for data analytics and marketing/advertising to consumers – indeed, that is why Defendant pays CarNow for its software.

32. CarNow does not even stop at Facebook; the company advertises that it has "more than 100 current integrations available." These include WhatsApp, Google Events, Google Adwords, and J.D. Power Chrome Data. *See* https://www.carnow.com/partners/integrations/ (last accessed in February, 2024).

33. CarNow's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under CIPA, rather than a mere extension of Defendant and/or party to the communication with Website visitors.

34. Given the nature of Defendant's business, visitors often share personal and/or confidential data, in addition to personally identifying information, with Defendant via the Website chat feature. Plaintiff did so.

35. Defendant did not inform Class members that Defendant was secretly allowing and aidingCarNow to intercept and eavesdrop on the conversations during transmission, or that CarNow provided data from such transcripts to Meta and similar

entities through "integration" of their softwares, to its affiliated entities, or even via the sale of consumer information.

36. Defendant did not obtain Plaintiff's or the Class members' effective consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

37. Defendant knew that CarNow was engaged in wiretapping and/or eavesdropping of California consumers, and knowingly provided CarNow with substantial assistance in doing so by offering up its customers' private personal data.

38. Specifically, Defendant's knowledge is demonstrated by the fact that it deployed the CarNow Real-Time Messaging feature to the Website for the specific purpose of assisting CarNow in gathering consumer data, and then re-branded the chat module to appear to be Defendant's own product so consumers would not suspect the truth.

39. Defendant's knowledge is further demonstrated by the fact that CarNow expressly promises its customers that it will gather consumer PII and use it to create digital profiles which it will then "integrate" with its "over 100" current integration partners.

40. Defendant's knowledge is further demonstrated by the fact that CarNow promises to generate leads for customers like Defendant by selling consumer data that it gathers via the Real-Time Messaging module.

41. Upon information and belief, it was precisely these promises to intercept and utilize consumer data, all while masquerading as Defendant's own product, that drove Defendant's decision to engage CarNow's services in the first place.

42. Upon information and belief, Defendant was also enticed by CarNow's offer to integrate with numerous other products and affiliate "partners," as identified on the CarNow website, to monetize on the consumer data that CarNow gathered and shared with other third parties—all without consumer consent.

## V.     CLASS ALLEGATIONS

26.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior effective consent.**

27.     NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the tens of thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

28.     COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a. Whether Defendant caused Plaintiff's and the Class's electronic communications with the Website to be recorded, intercepted and/or monitored;

    b. Whether Defendant aided the third party in eavesdropping on such communications;

    c. Whether Defendant violated CIPA based thereon;

    d. Whether Plaintiff and Class Members are entitled to punitive damages pursuant to Cal. Civil Code § 3294; and

    e. Whether Plaintiff and Class Members are entitled to injunctive relief.

29.     TYPICALITY: As a person who visited Defendant's Website and had her electronic communications recorded, intercepted and monitored, Plaintiff is asserting claims that are typical to the Class.

30. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

31. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI.    CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

32. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

33. "Any person who, by means of any machine, instrument, or contrivance, or in any other manner,… [ii] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)).

34. Section 631(a) of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications

with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA § 631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

35. CarNow's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

36. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class members with Defendant's Website to be recorded. Defendant also aided, agreed with, employed, or conspired with CarNow to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding CarNow Real-Time Messaging software code on Defendant's Website.

37. Defendant knows that CarNow, through software, captures the electronic communications of visitors to Defendant's Website, and pays it to conduct these activities.

38. In fact, these are the exact activities for which Defendant contracts with CarNow in the first place: to intercept consumer data, use it to create digital profiles on consumers, and integrate with other third-parties including Meta and CarNow's other affiliates or partners.

39. Plaintiff and Class members did not expressly or impliedly consent to any of Defendant's or CarNow's actions.

40. In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA. *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. . . . Byars alleges that, using the chat conversation, website visitors share sensitive personal information. . . . Because Byars has pled sufficient facts to show the contents of the communications and that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).*") (emphasis added).

41. Defendant's conduct violates Cal. Penal Code § 631(a), entitling Plaintiff and/or Class members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Punitive damages;

7. Prejudgment interest;

8. Reasonable attorneys' fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: February 20, 2024
PACIFIC TRIAL ATTORNEYS, APC

By: _____
Scott. J. Ferrell
Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I electronically filed the foregoing **SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

　　　　　　　　　　　　　　　　　　　*/s/ Scott J. Ferrell*
　　　　　　　　　　　　　　　　　　　　Scott J. Ferrell